Lambert WALSH

v.

**BOSTON SAND & GRAVEL COMPANY.**

No. 58-885.

United States District Court
D. Massachusetts.
June 30, 1959.

---

Morris D. Katz, Boston, Mass., for plaintiff.

Hale & Dorr, Blair L. Perry, Boston, Mass., for defendant.

ALDRICH, District Judge.[1]

This is an action by a seaman in the usual three counts. The plaintiff was injured on March 18, 1957. At that time he was 71 years old. He had been a seaman the greater part of his life, but from 1953 to 1956 had "retired" to Snug Harbor, Staten Island. In January, 1957 he became employed by the defendant to man its scow No. 34. On March 10 he received a minor injury ashore. He returned to work March 18, when the scow was about to be towed from Cambridge, Massachusetts through the lock at the Charles River dam. The tow was made up of the tug St. Theresa, the No. 34, and the No. 32. One Fournier, of the Fournier Towboat Co., was master of the tug, and one Leo MacDonald, now deceased, was on the No. 32. As they proceeded to the lock the plaintiff passed a bow line to the dockman on the pier, who slipped the eye over a bollard while they waited. Subsequently they moved further down the pier, the dockman carrying the eye, and on the signal of the tug placing it over another bollard. There is a dispute as to what happened thereafter. The plaintiff testified he put a turn around the forward bit to snub her, paying out as the scow progressed, and trying to get another turn, but that the tug was going fast, and the line was new, heavy, and hard to manage, and his leg was caught and pulled into the bit and broken. (Some indication of the amount of way on the barge may be gathered from the fact that this parted the line.) According to the plaintiff the line was a 7″ (circumference) new hawser. According to defendant it was a new 4″ dock line. I accept plaintiff's version. A hawser is too heavy to use for a dock line.[2] The plaintiff stated

---

1. A more extensive finding of facts and discussion of the evidence was handed down on May 25. Said findings are not changed, except to the extent expressly stated herein.

2. The defendant says, properly, that equipment need only be "reasonably safe," citing Doucette v. Vincent, 1 Cir., 194 F.2d 834, 837, and that a hawser would be reasonably safe. I find, however, that if a dock line has to be

he could have handled it nevertheless, had it not been for the excessive speed of the tug. I find, in accordance with this testimony, that the barge was unseaworthy, and that this fact, coupled with the negligent speed of the tug, caused the accident. I do not find for the plaintiff on the Jones Act, 46 U.S. C.A. § 688, count, as the barge is not always manned, and it is apparent that a dock line might have been stolen at any time, and there is no evidence as to how long this one had been missing. In addition, it would seem that the plaintiff was the one who should have checked the lines before taking off.

■ The defendant asserts contributory negligence. There was evidence that plaintiff was intoxicated. I am inclined to think that, although not intoxicated, he had had a drink or two. But whether that be so or not, it is clear that he became badly caught in the rope. For a man trained to handle lines this is a cardinal sin. I find the occurrence did not happen in the manner plaintiff testified, but that he stood or stepped inside a loop, and that this was gross negligence. The most significant item in this regard is plaintiff's testimony that he payed or had out about ten fathoms before he was caught. The dockman testified that about twenty feet separated him from the plaintiff when he got caught, and the bollard was closer to plaintiff than that. I accept his testimony. Even some of this under-twenty-feet was out to begin with. Plaintiff's contrary testimony shows either extreme confusion on his part, or worse.

■ Plaintiff's contention that he acted reasonably in view of an "emergency" overlooks the fact that the possibility of the tug's coming in fast was precisely one of the things he was there to expect and guard against. It is to be borne in mind that his principal, and apparently his only job at the moment, was taking care of the lines, and that he knew in advance he might have to pay out and

snub. He had just been handling this particular line at the stop further down the pier, and was accordingly responsible for whatever way it was lying on the deck. A 7″ hawser (2¼″ diameter) is not unmanageable, and undoubtedly plaintiff was accustomed to one. If he had been suddenly required to pay out as much as ten fathoms I might have found little or no contributory negligence, but the stiffness of the rope should have but little effect at first, and for plaintiff to get his leg caught in paying out a few feet in my opinion virtually eliminates defendant's contribution as against his own. I find defendant's contribution to the accident 10%, the tug's 20%, and plaintiff's 70%.

■ Turning to the effect of contributory negligence, the Fournier Towboat Co. is not a defendant. Fournier is not on the defendant's payroll. The defendant pays for each tow by the job. Fournier was in complete charge of the operation. During the trial I stated that in my opinion the towing company was an independent contractor. Plaintiff made no reply, except to suggest that if the scow was proceeding too rapidly it was unseaworthy. The mermaid's tail will not stand that much of a twist. I accordingly regard the question to be whether joint tort-feasors are entitled to view the plaintiff's contributory negligence in relation to their own individual negligence, or from the standpoint of their combined negligence. In other words, is the defendant, whose contribution was 10% as against plaintiff's 70%, liable for ⅛th of the damage, or is it liable for 10% plus 20% as against 70%, or 30%? There is still another possibility, that each joint tort-feasor should be liable to the extent of the one most culpable, making this defendant liable for 2⁄9ths.

■ This appears to be a question of first impression. The theory of joint tort liability is that each defendant is legally responsible for the entire damage

handled in a hurry, particularly if a quantity of it has to be so handled, a

hawser becomes unreasonably cumbersome.

even though his own conduct may have been only a small part of the whole. In other words, had there been no contributory negligence, this defendant would have been liable for the full amount. (In fact it would not even have been entitled to contribution from the towing company. Halcyon Lines v. Haenn Ship Ceiling and Refitting Corp., 342 U.S. 282, 72 S.Ct. 277, 96 L.Ed. 318.) On the other hand, at common law the defendant would not have been liable at all if the accident was in any respect due to plaintiff's own negligence. The defendant argues that the admiralty theory of apportioning the damages should modify the principle of treating all joint tort-feasors alike insofar as contributory negligence is concerned. While originally I was receptive to that contention, my final conclusion is that the damages should be reduced only by the amount of plaintiff's negligence in the overall picture, so that the defendant's liability should be 30%.

Computing damages, I commence with Count 3, for maintenance and cure. It is stipulated the medical expenses were $1,533. The parties agree to a maintenance rate of $6 a day. This will be for 21 months disability, less the 13 months plaintiff was confined in the hospital, or 8 months, $1,460.

█ The question arises, since I have found lost earning capacity for this same period, what, if any, credit is to be given on Count 2, for unseaworthiness, for the maintenance award. In this connection plaintiff's $56 a week wage required him to provide his own food. The $6 a day Count 3 maintenance does not purport to represent the stipulated value of board and living quarters furnished by the defendant, but simply the agreed value of maintenance such a seaman deprived of all earnings should receive.[3] The plaintiff was furnished on the No. 34, while working, with a bunkroom, stove, and fuel. I find the fair value of that to be $10 a week, and part of his total earnings. (This is not the same question it would be if this were an income tax case. Internal Revenue Code of 1954, 26 U.S. C.A. § 119.) In other words, the plaintiff's earning capacity, as fairly indicated by his current earnings in view of his age, was $56 plus $10, or $66 a week. I have already awarded $42 a week on Count 3 for eight months. In order to avoid double payment, this should be credited on Count 2. That leaves $24 a week for lost earning capacity for eight months, and $66 for thirteen, a total of $4,550. On Count 2 there is no unpaid medical expense. For pain, suffering and confinement in the hospital I award $12,000,[4] making a grand total of $16,550. 30% of this is $4,965.

Count 1. Dismissed.

Count 2. A finding for the plaintiff in the amount of $4,965.

Count 3. A finding for plaintiff in the amount of $2,993 with interest in the amount of $277, or $3,270.

Costs to be taxed in favor of the plaintiff.

3. In Reardon v. California Tankers Co., 2 Cir., 260 F.2d 369, certiorari denied 359 U.S. 926, 79 S.Ct. 609, 3 L.Ed. 2d 628, the court refused to allow any deduction from the plaintiff's cash earning capacity for the payment of $8 a day maintenance provided for in his union contract (which I equate with a stipulated rate as in the case at bar). If the court's position was that in the absence of evidence the maintenance award is to be regarded as the equivalent in value to what the seaman receives on board ship in addition to his wages, then I have no quarrel with the decision. See discussion, infra. But that award is not necessarily the same, and the case at bar indicates it may be substantially different.

4. The special reasons for this figure were explained in my earlier memorandum.